IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| William D. Riley El (#B-03069), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 5768 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| Salvador Godinez, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William D. Riley El, who is currently incarcerated at Pontiac Correctional Center and proceeding *pro se*, brought this 42 U.S.C. § 1983 action claiming unconstitutional conditions of confinement and deliberate indifference to his medical needs when he was incarcerated at Stateville Correctional Center. Named as Defendants are Darryl Edwards, Marcus Hardy, Salvador Godinez, and Joseph Sheehy (hereafter collectively "IDOC Defendants") and Dr. Imhotep Carter (hereafter "Defendant Carter"). Both the IDOC Defendants and Defendant Carter have filed motions for summary judgment, which are currently before the Court. Plaintiff has responded. For the reasons that follow, the Court grants both the IDOC Defendants' and Defendant Carter's motions.

## Background

### A.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Under

Local Rule 56.1(a)(3), the moving party must provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. L.R. 56.1(a)); *see also* Fed. R. Civ. P. 56(c). The opposing party must then "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran, Exp., Inc*., 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. L.R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc*., 527 F.3d 635, 643 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)).

The parties have generally complied with Local Rule 56.1; both the IDOC Defendants and Defendant Carter each submitted a Statement of Uncontested Facts, (Dkts. 103, 96), to which Plaintiff responded. (Dkt. 107 at pp. 1-19.) Plaintiff also filed the non-movant's optional statement of additional facts, (Dkt. 107 at pp. 20-23), and submitted in support his own declaration with accompanying exhibits (Dkt. 107 at. pp. 24-181), to which he cited throughout his response and statements of additional facts. Neither the IDOC Defendants nor Defendant Carter argue that Plaintiff's responses, additional facts, declaration or attachments fail to comply with the Local Rule.[1]

---

[1] Plaintiff is an experienced litigator in this Court, having filed six other civil rights actions in the Northern District of Illinois. *See Riley El v. Illinois Department of Corrections, et al.,* No 11 C 4401; *Riley El v. Illinois Department of Corrections, et al.,* No. 13 C 5771; *Riley El v. State of Illinois,* No 13 C 5773; *Riley El v. Lemke, et al.,* No 13 C 8656; *Riley v. Godinez, et al.,* No. 15 C 10530; *Riley El v. Godinez, et al.,* 15 C 11180. In addition to substantially complying with Local Rule 56.1, Plaintiff also filed a thorough, 21-page, response memorandum of law. (Dkt. 105, Pl.'s Resp. Mem.)

The facts are therefore taken from the parties' N.D. Ill. Local Rule 56.1 Statements of Material Facts ("SOF") and facts included in Plaintiff's responses and supporting declaration, where he is competent to testify as to those facts. *See Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (stating that courts may decide a summary judgment motion based on a factual record established by the parties' Rule 56.1 Statements). The Court will accept as true any undisputed statements of fact from the parties' statements. Where Defendants' statements are properly supported by the cited materials and are not otherwise disputed by evidence Plaintiff raises, including his deposition testimony and declaration, the Court will consider those statements as undisputed. *See* Local Rule 56. 1(b)(3)(C); *see also Almy v. Kickert Sch. Bus Line, Inc*., No. 08-cv-2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs*., 233 F.3d 524, 529 (7th Cir. 2000)). The Court has carefully examined each response submitted by Plaintiff for relevancy, evidentiary support, and admissibility in construing the facts of this case and gives deference to Plaintiff's version of the facts where they are properly presented and supported by admissible evidence. The Court will, of course, not consider purely legal arguments, incomplete responses that lack evidentiary support, or responses that are inconsistent with deposition testimony.

With the above factors in mind, the Court turns to the facts of this case.

**B.     Facts**

**1.     Parties**

Plaintiff William Riley is an IDOC inmate, who during the time period relevant to this lawsuit, was incarcerated at Stateville Correctional Center. (Dkt. 103, IDOC SOF at ¶ 4.)

During the relevant time period, Defendant Sheehy was a Correctional Medical Technician at Stateville, Defendants Edwards and Hardy were the Assistant Warden and Warden, respectively, at Stateville, and Defendant Godinez was the Director of the IDOC. (*Id.* at ¶¶ 2-5.) Defendant Carter is a licensed physician in Illinois and served as the Medical Director of Stateville from July 25, 2011 through May 10, 2012. (Dkt. 96, Carter SOF at ¶ 2.)

### 2. Claims

Plaintiff raises two claims in this lawsuit. (Dkt. 103, IDOC SOF at Ex. A.) First he claims that from 2003 through 2012, Defendants Edwards, Hardy, and Godinez were deliberately indifferent to unconstitutional conditions of his confinement at Stateville, specifically that the prison's drinking water was systemically contaminated with radium and lead. (*Id.*) He second claims that all the IDOC Defendants and Defendant Carter were deliberately indifferent to his medical needs arising after he allegedly became ill from one instance of drinking the contaminated water in January 2012. (*Id.*)

### 3. January 5, 2012 Incident

On January 5, 2012, Plaintiff drank water from the sink in his cell. (Dkt. 103, IDOC SOF at ¶ 17.) Upon drinking it, Plaintiff realized it was brownish in color, had a salty taste, and foul smell. (*Id.*; Dkt. 107, Pl.'s Decl. at ¶ 2.) About five to ten minutes later, Plaintiff started having sharp stomach pains that he had never had before. (Dkt. 107, Pl.'s Decl. at ¶ 2.) Approximately one hour later, Plaintiff was seen by Defendant Sheehy. (Dkt. 103, IDOC SOF at ¶ 18.) Plaintiff told Defendant Sheehy that he was having sharp stomach pains from drinking the water. (Dkt. 107, Pl.'s Decl. at ¶ 2.) Defendant Sheehy took Plaintiff's vitals and provided Plaintiff with Amalgam and Milk of Magnesia for his upset stomach. (Dkt. 103, IDOC SOF at ¶ 18.) Plaintiff

asked Defendant Sheehy to see a doctor. (Dkt. 107, Pl.'s Decl. at ¶ 2.) This was Plaintiff's only interaction with Defendant Sheehy regarding the January 5, 2012 incident. (Dkt. 103, IDOC SOF at ¶ 21.) Starting the following day, Plaintiff began to have diarrhea. (Dkt. 103, IDOC SOF at ¶ 20.)

Plaintiff filed a grievance at the prison regarding the incident, which is dated the same day, January 5, 2012. (Dkt. 96, Carter SOF at ¶ 10.) The grievance describes the incident, the stomach pains that resulted from drinking the water, and Plaintiff's interactions with Sheehy. (Dkt. 96, Carter SOF at Ex. 5 at pp. 3-4.) It also states that his stomach was still hurting, and Plaintiff requested to be provided with drinkable water and to be seen by a doctor. (*Id.*) The grievance was denied, and Plaintiff unsuccessfully appealed it to the Administrative Review Board. (*Id.* at pp. 1-2.)

**4.      Plaintiff's letters to Defendants**

Plaintiff testified at his deposition that he wrote two letters regarding the January 5, 2012 incident to each of Defendants Edwards, Hardy, and Godinez, but he describes only one such letter to each of these Defendants in his Declaration and has submitted copies of only one such letter to each Defendant. (Dkt. 103, IDOC SOF at ¶ 14 and at Ex. A, pp. 15-20; Dkt. 107, Pl.'s Decl. at ¶¶ 30, 32, 33.) Plaintiff's letters to Edwards, Hardy, and Godinez are dated January 30, 2012, February 5, 2012, and February 15, 2012, respectively. (Dkt. 107, Pl.'s Decl. at ¶¶ 30, 32, 33; IDOC SOF at Ex. A, pp. 15-20.) Each letter describes the incident and asks the Defendant to "do something about the unsafe drinking water". (*Id.*) Each letter also states that Plaintiff is continuing to experience severe stomach pains and diarrhea (and also headaches), that he wrote to

Dr. Carter informing him of the situation but has not heard anything in response, and that he needs to be seen by a doctor.   (*Id.*)

Plaintiff wrote one letter to Defendant Carter as well.   (Dkt. 96, Carter SOF at¶ 19; Dkt. 107, Pl.'s Decl. at ¶ 29; IDOC SOF at Ex. A, p. 14.)   The letter is dated January 15, 2012 and states that Plaintiff is having severe stomach pains, headaches, and diarrhea from having drunk the dirty water on January 5, 2012.   (Dkt. 107, Pl.'s Decl. at ¶ 29; IDOC SOF at Ex. A, p. 14.) Plaintiff requests in the letter that he be seen by Dr. Carter for treatment.   (*Id.*)   Plaintiff had not tried to communicate with Defendant Carter about his problems related to the drinking water prior to sending this letter.   (Dkt. 96, Carter SOF at¶ 19.)   Dr. Carter testified that he did not receive the January 15, 2012 letter or any other letters from Plaintiff concerning his stomach problems. (*Id.* at 22.)

Plaintiff also dropped two sick call requests in the box, one on January 5, 2012 and one on January 15, 2012, requesting treatment for his stomach pain from drinking dirty water.   (Dkt 103, IDOC SOF at Ex. A at pp. 12-13.)

### 5.      Plaintiff's access to water

After the January 5, 2012 incident, Plaintiff never drank the water from his sink again. (Dkt. 103, IDOC SOF at ¶ 19.)   Plaintiff had access to milk and water at the dining hall twice a day during lunch and dinner, but he declined to drink it because he believed that the plastic cups used to serve the water were not thoroughly cleaned.   (Dkt. 103, IDOC SOF at ¶ 19 and at Ex. B. 40: 4-18.)   Plaintiff instead drank bottled water; he received approximately 40-45 bottles of water per month, either by purchasing them from the commissary or by trading for them with other

inmates in exchange for other commissary items. (Dkt. 103, IDOC SOF at ¶ 19 and at Ex. B. 40: 4-18.)

Plaintiff also testified that the only time he personally had any problems with the water at Stateville prior to January 2012 was "three or four times" when the water in the showers came out brown, but he moved out of the way. (Dkt. 103, IDOC SOF ¶ 16.)

### 6. Evidence regarding water contamination

The IDOC Defendants have submitted an affidavit from Michael Studer, who was a licensed Class B Water Operator at Stateville from 2002 to 2014. (Dkt. 103, IDOC SOF at Ex. B.) As the Water Operator at Stateville, he was responsible for taking samples of the water at Stateville and sending the samples to laboratories for analysis pursuant to the Illinois Environmental Protection Agency (EPS) sampling schedule. (*Id.* at ¶ 3.) Studer testified that in 2004, the City of Crest Hill began supplying water to Stateville. (*Id.* at ¶ 4.) He also testified that from 2004 to 2014, there were no instances in which the water at Stateville exceeded the EPA standards for copper, lead, or radium. (*Id.* at ¶ 5.)

Plaintiff submitted and cited to in his declaration and/or LR 56.1 materials the following evidence:

- Excerpts of EPA reports for the water in both Crest Hill, Illinois and Stateville for the years 2002, 2003, 2004, 2007, 2008, and 2009. (Dkt. 107, at Exs. 3A-3T.)

The excerpts that Plaintiff submitted show that levels of some contaminants in Stateville's water in 2002, 2003, and as of March 2004 were deemed violations of EPA standards. (Dkt. 107, at Exs. 3A-3C.) The excerpt for 2002 also states that Stateville was working to completely upgrade its system by November 2003 as a means of correcting the violations. (*Id.* at Ex. 3A.) The provided excerpts of the reports for years 2007, 2008, and 2009 show that the Illinois EPA

tested Stateville and/or Crest Hill's water for the presence of 14 contaminants each year, and in each of those years found that the levels of all 14 contaminants did not violate EPA standards. (*Id.* at Ex. 3D-3T.) The provided excerpts for 2007-2009 also each include a section titled "Source Water Assessment", which note that certain of Crest Hill's wells are not susceptible to contamination, and that certain wells are susceptible. (*Id.*) Plaintiff provided no EPA reports for the years 2010, 2011, or 2012.

- A May 2008 letter to a warden of Stateville from the Illinois EPA regarding Stateville's 2008 inspection report. (Dkt. 107 at Ex. 4A.)

This letter notified Stateville officials that, following a routine periodic inspection of Stateville's water supply in April 2008, the Illinois EPA determined that aspects of the water system "may" not comply with certain regulatory standards regarding monitoring, testing, and reporting. (Dkt. 107, Pl.'s at Ex. 4A.) For example, the letter states that in the preceding year the Illinois EPA had not received certain required monthly operating reports from Stateville, and that the Illinois EPA had not received a copy of Stateville's "cross connection control policy". (*Id.*). The letter provided Stateville 45 days to respond to the potential violations and explicitly states that "it is NOT a violation notice". (*Id.*) (emphasis in original).

- A letter dated June 2011 to an inmate at Stateville from the Director of the Water Division of the Illinois EPA. (Dkt. 107, Ex. 8.)

This letter begins by stating that there is "no straightforward answer to your question about the build-up of contamination in water pipes over time". (Dkt. 107, Ex. 8.) It explains that pipes "can corrode". (*Id.*) The letter also explains that if water shows signs of calcium or lime deposits, "it is possible" that radium could be captured in those deposits. (*Id.*) The letter

concludes with a note that the Director hopes the inmate-recipient finds the information useful. (*Id.* at Ex. 8.)

- Affidavits from three other inmates in Cell House D.   (Dkt. 107, Exs. 10-11 and 13.)

Plaintiff lastly submitted affidavits from three inmates who lived in the same cell house as Plaintiff (Cell House D) during at least some portion of time between 2003-2012.   (Dkt. 107, Exs. 10-11 and 13.)   These inmates each testified that there were notices posted in the prison instructing the staff not to drink the water in the prison, that maintenance workers would often cut off the water in the cell house for hours without warning, and that when it came back on it would run rusty and yellow in color and foul smelling.   (*Id.*)

### 7.     Plaintiff's Medical Care

Four days after the incident**,** on January 9, 2012, Plaintiff saw Dr. Carter for routine follow-up of his pre-existing chronic renal insufficiency.   (Dkt. 96, Carter SOF at ¶¶ 15-16.)   Dr. Carter performed a physical examination and found Plaintiff to be healthy.   (*Id.*)   He ordered a comprehensive metabolic panel of lab tests and scheduled Plaintiff for a follow up appointment in 30 days.   (Dkt. 96, Carter SOF at ¶¶ 15-16.)   Plaintiff did not complain at this appointment about any symptoms resulting from drinking the dirty water on January 5, 2012.   (*Id.* at ¶ 6.)   Plaintiff's blood was drawn on January 18, 2012 for the tests that Dr. Carter had ordered on January 9, 2012. (*Id.* at ¶ 18.)

On January 31, 2012, Plaintiff saw Dr. Carter for a physical examination.   (*Id.* at ¶ 24.) At that appointment, Plaintiff complained of gastric pain – specifically having stomach pain and diarrhea for almost a month.   (*Id.*; Dkt. 107, Pl.'s Decl. at ¶ 31.)   Plaintiff weighed 229 pounds at that time. (Dkt. 96, Carter SOF at ¶ 24.)   Dr. Carter assessed Mr. Riley with chronic renal

insufficiency, gastritis -NOS[2], toenail onychomycosis (a fungal infection), and chronic left knee pain. (*Id.*) Based on the January 31, 2012, physical examination, Dr. Carter ordered tincture of benzoin treatment for Mr. Riley's toes, physical therapy for his knee, and requested a stool sample to check for ova and parasites in relation to his gastritis complaint. (*Id.* at ¶ 25.) Dr. Carter had previously prescribed pain medication called Ultram and performed a corticosteroid injection in relation to Mr. Riley's complaints of knee pain. (*Id.* at ¶ 25 and at Ex. B at p. 3.)

Plaintiff was also seen periodically in the hypertension clinic at Stateville. (*Id.* at ¶ 27.) On February 16, 2012, Plaintiff was seen by Dr. Dubrick in the hypertension clinic. During his visit with Dr. Dubrick, Mr. Riley complained of stomach pain, headaches, and diarrhea. (*Id.* at ¶ 28; Dkt. 107, Pl.'s Decl. at ¶ 34.) Dr. Dubrick also made a request for a stool sample and planned to see Plaintiff in two to three weeks. (Dkt. 96, Carter SOF at ¶ 29.) Plaintiff testified that someone also prescribed a stool hardener for him based on his complaint of diarrhea. (*Id.* at ¶ 30.)

Four days later, on February 20, 2012, Plaintiff again saw Dr. Carter for the same gastrointestinal complaints. (*Id.* at ¶ 31.) Plaintiff had lost one pound, at that time weighing 228 pounds. (*Id.*) Dr. Carter's medical note of this visit states that Dr. Dubrick was managing Plaintiff's gastrointestinal complaints well. (*Id.* at ¶ 32.)

Plaintiff provided the previously requested stool sample on February 23, 2012. (*Id.* at ¶ 35.) The lab results on Plaintiff's stool, dated February 28, 2012, indicated a normal stool. (*Id.* at ¶ 36.) Specifically, the sample tested negative for *Helicobacter pylori* with no parasites seen

---

2 "Gastritis" describes a group of conditions that have inflammation of the stomach in common. The inflammation is most often the result of infection. http://www.mayoclinic.org/diseases-conditions/gastritis/basics/definition/con-20021032. "NOS" stands for "not otherwise specified", and means a condition does not meet any further specific diagnosis. *See* https://www.verywell.com/not-otherwise-specified-nos-1066918; http://www.newhealthguide.org/What-Does-Nos-Mean.html

and normal fecal flora. (*Id.*) *Helicobacter pylori* is a common bacteria found in the digestive tract that can be contracted through unclean water. (*Id.*) This bacteria was not present in Plaintiff's stool. (*Id.*) Plaintiff had normal fecal flora (microorganisms) in his stool. (*Id.*) It is Dr. Carter's opinion that based on the lab results of February 23, 2012, Plaintiff had no apparent ongoing gastrointestinal problem at that time. (*Id.* at 43.)

In February 2012, Dr. Carter also planned a collegial review to consider a referral of Plaintiff to the University of Illinois Hospital Renal Clinic for further evaluation of his chronic renal insufficiency. (*Id.* at ¶ 33.) On February 27, 2012, Dr. Carter presented Plaintiff in a collegial review and obtained approval for an appointment for him via video telemedicine with a physician at the University of Illinois Hospital Nephrology Clinic. (*Id.* at ¶ 34.) Plaintiff testified that he had "a few" appointments via video telemedicine with the University of Illinois Hospital Nephrology Clinic, and that later in 2013-2014, he had seven to eight in-person appointments at the Clinic. (Dkt. 103, IDOC SOF at Ex B. at 88:4 – 91:8.)

On March 30, 2012, Plaintiff completed and signed a "Medical Services Refusal", refusing to continue to take the Ultram prescribed for his knee pain because of Plaintiff's stomach pain. (Dkt. 107, Pl.'s Decl. at ¶ 37; Dkt. 107 at pp. 111 and 122.) Plaintiff testified that he let Dr. Carter know of this decision. (Dkt. 107, Pl.'s Decl. at ¶ 37.)

Plaintiff's last visit with Dr. Carter was on May 9, 2012, when Dr. Carter saw Plaintiff in relation to his re-injuring his surgically repaired left knee. (Dkt. 96, Carter SOF at ¶ 37.) Dr. Carter assessed Plaintiff with post-arthroscopy degenerative joint disease and a recent contusion to the left knee. (*Id.*) Dr. Carter prescribed Tramadol (a pain reliever and the generic for Ultram) and Solu-Medrol (an anti-inflammatory glucocorticoid). (*Id.*) Plaintiff testified that he also

complained of stomach pain at this appointment, although there is no such notation in Plaintiff's corresponding medical records.   (Dkt. 107, Pl.'s Decl. at ¶ 39.)

Dr. Carter left Stateville in May 2012 and has not been involved in Plaintiff's medical care since.   (Dkt. 96, Carter SOF at ¶ 38.)

## Analysis

### I.      Summary Judgment Standard Under Fed. R. Civ. P. 56

Pursuant to Federal Rule of Civil Procedure 56(a), this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   To establish that a material fact is undisputed, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."   Rule 56(c)(1).   "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3).   This Court must "construe all facts and draw all reasonable inferences in favor of the nonmoving party in determining whether the moving parties have demonstrated that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute."   *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).   The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a

genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if there is evidence "to permit a jury to return a verdict for" the nonmoving party. *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010).

## II.   Deliberate Indifference to Contaminated Water

The Eighth Amendment entitles prisoners to humane conditions of confinement that provide for their "basic human needs." *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). This includes "adequate food, clothing, shelter, and medical care." *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). However, the Eight Amendment neither requires "the most intelligent, progressive, humane, or efficacious prison administration," *Oliver v. Deen*, 77 F.3d 156, 161 (7th Cir. 1996), nor "a maximally safe environment, one completely free from pollution or safety hazards", *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). A claim of constitutionally inadequate confinement requires a two-step analysis: (1) "whether the conditions at issue were sufficiently serious so that a prison official's act or omission result[ed] in the denial of the minimal civilized measure of life's necessities"; and (2) "whether prison officials acted with deliberate indifference to the conditions in question." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal quotation marks and citation omitted). Defendants argue that Plaintiff's water-contamination claim fails at the first prong, and, as explained below, this Court agrees.

[13]

To establish the objective prong of an Eighth Amendment violation, the challenged condition must amount to an "extreme deprivation," *Hudson v. McMillan*, 503 U.S. 1, 9 (1992), and "pose[] an unreasonable risk of serious damage to [the inmate's] future health," *Helling v. McKinney*, 509 U.S. 25, 35 (1993). The plaintiff must also show that society has chosen not to tolerate the risk at issue. *Helling*, 509 U.S. at 36.

The Seventh Circuit has addressed the constitutionality of Stateville's drinking water. *See Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001). The court affirmed summary judgment for Defendants because the evidence showed that the contamination levels then present in Stateville's water did not violate EPA standards and would not have required Defendants to take remedial action had they been detected outside a prison. *Id.* at 472-73. The court explained that deliberately supplying inmates with water containing carcinogens and contaminants can be considered cruel and unusual punishment. "But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not." *Carroll,* 255 F.3d at 472. "Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Id.*

The IDOC Defendants argue that Plaintiff has not presented any evidence demonstrating contamination of the water supply at Stateville during the relevant time period[3] in concentrations greater than the Seventh Circuit found constitutionally acceptable in *Carroll*. (Dkt. 101, IDOC Mem. at 3-4.) The IDOC Defendants contend that their own evidence (Studer's affidavit) is undisputed that from 2004 – 2014 Stateville's water was sourced from the City of Crest Hill and there were no instances where the water at Stateville exceeded the EPA standards for copper, radium, or lead. (*Id.*)

In response, Plaintiff argues that the evidence shows that the IDOC Defendants knew that radium and other harmful contaminants exceeded the established limits from 2003 to 2012, and thus exposed inmates to a cancer risk, but Defendants failed to switch to an uncontaminated water source. (Dkt. 107, Pl.'s' Decl. at pp. 24-25, ¶¶ 5-7; Dkt. 105, Pl.'s Resp. Mem. at 15.) Plaintiff also contends that the evidence demonstrates that the IDOC Defendants failed to sample, test, monitor, and report on Stateville's water in violation of various EPA standards. (Dkt. 107, Pl.'s Decl. at pp. 27-28, ¶¶ 11-15.) Plaintiff relies on the evidence, described above (*supra* at pp. 7-9), to support these contentions: (1) his testimony that one day in January 2012 the water in his cell was brown and foul-smelling and made him ill (Dkt. 107, Pl.'s Decl. at pp.24-25, ¶¶ 2-4); (2) the affidavits from two other inmates in D-House that the water in their cells likewise sometimes came

---

[3] Defendants contend that the majority of Plaintiff's evidence should be disregarded because it predates the allegations of the complaint, which, according to the IDOC Defendants, "only concern the water at Stateville in 2012". (Dkt. 109, IDOC Reply at 2, n.1.) Defendants assert that Plaintiff's arguments in his summary judgment materials that he was subjected to contaminated water from 2003 through 2012 are improper attempts by Plaintiff to amend his complaint in a response brief to a motion for summary judgment. *See Shanahan v. Chicago,* 82 F.3d 776, 781 (7th Cir. 1996). Liberally construing Plaintiff's complaint, however, this Court cannot read it as narrowly as do the IDOC Defendants, nor did this Court so construe the complaint in its 28 U.S.C. § 1915A screening order. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam) (courts also construe *pro se* complaints liberally). (Dkt. 4.) Plaintiff's complaint explicitly states that *"Plaintiff has been exposed to unsafe drinking water since coming to Stateville. Defendants have known about the unsafe drinking water since before Plaintiff was an inmate here at Stateville."* (Dkt. 103, IDOC SOF at Ex. A at p. 1.) These allegations put the IDOC Defendants on notice that Plaintiff claimed contamination existed at Stateville before the 2012 incident.

[15]

out brown and foul-smelling (*id.* at Exs. 10-13); (3) the piecemeal excerpts of the EPA reports for the water in both Crest Hill, Illinois (from which Stateville's water is supplied) and Stateville for the years 2002, 2003, 2004, 2007, 2008, and 2009 (*id.* at Exs. 3A-3T); (4) the May 2008 Illinois EPA letter regarding Stateville's 2008 inspection report (*id.* at Ex. 4A); and (5) the EPA's 2011 letter to an inmate regarding the how contaminants build-up in pipes (*id.* at Ex. 8).

Although the Court allowed Plaintiff's claim to proceed at the screening stage, the now-established evidentiary record demonstrates that Plaintiff cannot succeed on this claim. The evidence shows no systemic contamination of Stateville's water above acceptable EPA levels. Thus, the Court finds that the evidence fails to demonstrate that exposure to Stateville's water subjected Plaintiff to cruel and unusual punishment.

In both his declaration and response brief, Plaintiff fundamentally misconstrues and misrepresents the evidence he presents. Plaintiff's contention that the EPA reports show widespread contamination, which violated EPA standards, is wrong. As explained above, the piecemeal excerpts that Plaintiff submitted show that the Illinois EPA tested Stateville and/or Crest Hill's water for the presence of 14 contaminants each year, and that in 2007, 2008, and 2009, found that the levels of all 14 contaminants did *not* violate EPA standards.[4] As the Seventh Circuit has explained, the Eighth Amendment does not entitle Plaintiff to "cleaner water" than he

_____

[4] Although the reports do indicate some violations in 2002, 2003, and possibly the first quarter of 2004, the evidence does not demonstrate *deliberate indifference* to those conditions. "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend,* 522 F.3d at 773. Here the evidence of record tends to demonstrate the contrary: that Stateville undertook efforts to remedy the problem, including, according to the EPA report itself, plans to "completely upgrad[e] the water main system throughout the facility" and plans to blend its water source with Crest Hill's. (Dkt. 107, Ex. 3A-3C.) Stateville also posted a Warden's Bulletin to all its staff and inmates in December 2003 stating that testing had shown that radium exceeded EPA limits in the water and that remedial efforts were underway. (Dkt 107, Ex. 5A.) Plaintiff does not dispute that Stateville switched its water source in 2004 to the City of Crest Hill's wells, and, as set forth, no violations were found in the 2007, 2008, and 2009 EPA reports. (Dkt. 103, IDOC SOF at Ex. B at 42: 21 – 44:20.) Plaintiff otherwise has not introduced any evidence demonstrating that the remedial efforts outlined were not undertaken.

would enjoy outside of prison, nor require prison authorities to take remedial action not otherwise mandated by authorities like the EPA. *Carroll,* 255 F.3d at 472. Plaintiff has also underlined sections of the reports that state that certain wells that source Crest Hill's and Stateville's water were "susceptible" to contamination and that describe the EPA's recommended steps to address the susceptibilities. But again, a mere finding of *susceptibilities* and a failure to undertake *optional prophylactic* steps cannot form the basis of an Eighth Amendment water-contamination claim. *Id.* And Plaintiff has submitted no documentation whatsoever for the years 2010, 2011, or 2012. The EPA reports do not tend to create a genuine issue of material fact that contaminants were present in Stateville's water to such a level that would offend the constitution.

Next, any inference of systemic contamination that Plaintiff draws from the EPA's 2011 letter to an inmate regarding build-up in pipes is not reasonable. (Dkt. 107, Pl.'s Decl. at p. 28, ¶ 19.) As explained, the letter states that "there is no straightforward answer to your question about the build-up of contaminants in pipes over time". (*Id.* at Ex. 8.) This letter appears to be addressing, in the most hypothetical and general of terms, the science of how/why pipes became contaminated. There is nothing in this letter whatsoever addressing Stateville's water specifically or evidencing systemic contamination. Plaintiff cannot create a genuine issue of fact with his own unsupported conjecture that Stateville's pipes are corroded.

Plaintiff next cites to the May 2008 Illinois EPA letter regarding Stateville's 2008 inspection report to contend that the IDOC Defendants failed to sample, test, monitor, and report on Stateville's water in violation of various EPA standards. (Dkt. 107, Pl.'s Decl. at pp. 27-28, ¶¶ 11-15 and Ex. 4A.) But this letter does not tend to support Plaintiff's broad contentions about the IDOC Defendants' alleged failures, nor does it otherwise establish the existence of systemic

contamination that violates the constitution. As explained, the letter notified Stateville officials that, in 2008, aspects of the water system "may" not comply with certain regulatory standards regarding monitoring, testing, and reporting, and provided Stateville 45 days to respond to the potential violations. The letter explicitly states that "it is NOT a violation notice". (Emphasis in original.) Moreover, even assuming purely for the sake of argument that these reporting and monitoring regulations were not adhered to in full at that time, the requirements of the EPA are not synonymous with the mandates of the Eighth Amendment. Seventh Circuit precedent teaches that substantially more than one instance of failing to adhere to EPA monitoring and reporting rules is required to demonstrate a deprivation that offends the constitution. *See, e.g., Oliver,* 77 F.3d at 161; *Carroll,* 255 F.3d at 472.

Plaintiff lastly contends that his testimony, and that of the inmates who provided affidavits attesting that the water in their cell house was sometimes cut off for hours and then came back on rusty, yellow, and foul-smelling, distinguishes this case from *Carroll* where no similar testimony was part of the record. (Dkt. 105, Pl.'s Resp. Mem. at 16-17.) But such evidence does not demonstrate a constitutional violation. Courts have held that "an inmate is not entitled to have running water in his cell." *Scruggs v. SinClair*, No. 3:16-CV-039 JD, 2016 WL 344534 at *2 (N.D. Ind. Jan. 27, 2016) (citing *Williams v. Collins*, No. 14 C 5275, 2015 WL 4572311 (N.D. Ill. July 29, 2015) (citing *Jelinek v. Roth*, No. 93-3316, 1994 WL 447266, at *2 (7th Cir. Aug. 19, 1994)); *see also Allen v. Hardy*, 11 C 4147, 2012 WL 5363415 at *8 (N.D. Ill. Oct. 26, 2012); *McNeal v. Ellerd*, 823 F. Supp. 627, 632 (E.D. Wisc. 1993). Plaintiff notably submitted no evidence that Stateville's water otherwise made him ill except on this single occasion in the over-a-decade timeframe that he has been incarcerated there – he testified at his deposition that the

[18]

only other time he had a problem with the water during his time at Stateville was "three or four times" when the water in the showers came out brown. (Dkt. 103, IDOC SOF ¶ 16.) *Compare George v. King*, 837 F.2d 705, 707 (7th Cir. 1988) (one incident of unintentional food poisoning does not violate the constitutional rights of affected inmates); *Jackson v. Lang*, No. 09 C 5123, 2010 WL 3210762 at *1 (N.D. Ill. Aug 10, 2010) (one incident of finding rodent parts in food does not indicate a constitutional violation). And even if Plaintiff could establish that tap water at Stateville is brown and foul smelling, he does not indicate he was deprived of drinking water. *McNeal,* 823 F. Supp. at 632 (although inmates have "a basic right to adequate drinking water," a "dysfunctional sink alone is not necessarily cruel and unusual punishment"). Plaintiff purchased or obtained by trade between 40-45 bottles of water a month for drinking. (Dkt. 103, IDOC SOF at ¶ 19 and at Ex. B. 40: 4-18.)[5]

Defendants having submitted evidence demonstrating that the levels of contaminants in Stateville's water were acceptable during the relevant time period, and Plaintiff having failed to controvert that evidence or demonstrate that he has been deprived of drinking water, summary judgment on this claim is appropriate. Summary judgment is granted in favor of the IDOC Defendants on Plaintiff's conditions-of-confinement claim.

## III.    Deliberate Indifference to Serious Medical Needs

Defendant Carter argues that summary judgment in his favor is appropriate, first, because Plaintiff failed to exhaust administrative remedies regarding his claim that he was deliberately

---

[5] The *Carroll* court was presented with evidence similar to the affiants' testimony regarding the notices to staff purportedly telling them not to drink the water. In *Carroll,* the Plaintiff presented evidence that Stateville provided its staff with bottled water to drink. *See Carroll,* 255 F.3d at 473. The Seventh Circuit found that this evidence did not tend to show that Stateville administrators were aware of a substantial hazard, reasoning that the water distribution might simply have been an effort to placate a fear amongst employees, but was not proof that the administrators shared the fear. *See id.*

indifferent to his medical needs, and, second, because Plaintiff's claim fails on the merits. The IDOC Defendants do not contest that Plaintiff exhausted his administrative remedies; they argue only that Plaintiff's claim fails on its merits.

A.    **Exhaustion of Administrative Remedies**

The Prisoner Litigation Reform Act requires the exhaustion of "administrative remedies as are available." 42 U.S.C. § 1997e(a).   An inmate must use " 'all steps that the agency holds out," and he must "do[ ] so properly (so that the agency addresses the issues on the merits).' " *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir. 2002)). "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Pavey v. Conley,* 663 F.3d 899, 905 (7th Cir. 2011). Because "the primary purpose of a grievance is to alert prison officials to a problem," *Maddox v. Love,* 655 F.3d 709, 722 (7th Cir. 2011) (internal citations and quotation marks omitted), the prisoner's grievance must alert the prison officials of the nature of the wrong for which the prisoner seeks redress, *Strong v. David,* 297 F.3d 646, 650 (7th Cir. 2002).   But, "[a]s in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming."   *Strong,* 297 F.3d at 650.   The burden of proof is on the defendant to demonstrate the prisoner failed to exhaust his administrative remedies.   *Turley v. Rednour,* 729 F.3d 645, 650 (7th Cir. 2013).

Defendant Carter argues that the single grievance that Plaintiff exhausted regarding the January 5, 2012 incident did not relate with sufficient particularity to his complaints about Dr. Carter in this lawsuit.   (Dkt. 97, Carter Mem. at 14-15.)   Defendants point to the fact that the grievance was dated January 5, 2012, and thus predated Plaintiff's January 15, 2012 letter to Dr.

Carter (his first request to him for treatment) and any of the following treatment Dr. Carter provided. Therefore Defendant Carter contends that, with respect to Plaintiff's deliberate indifference claim against him, Plaintiff failed to exhaust his administrative remedies.

The Court concludes that Plaintiff's grievance notified prison authorities of the nature of the same wrong – denial of medical care – that Plaintiff now claims against Dr. Carter, thereby satisfying *Strong*'s lenient "notice-pleading" standard for exhausting his deliberate indifference claim against Dr. Carter. *See Strong,* 297 F.3d at 650. Plaintiff stated in the grievance that, among other things, his stomach pains persisted after his interaction with the medical technician Sheehy and that Plaintiff wanted to see a doctor. (Dkt. 96, Carter SOF at Ex. 5 at pp. 3-4.) The grievance thereby timely alerted prison officials to a "shortcoming" in Plaintiff's medical care for his stomach pains, and invited corrective action. Plaintiff was not required to re-submit a new grievance after each instance of allegedly being denied treatment or receiving unsatisfactory treatment because Plaintiff's deliberate indifference claim is in the nature of a continuing violation. *See Poullard v. Blanco,* No. Civ.A. 05–1019–P., 2006 WL 1675218, at *8 (W.D. La. Jun. 9, 2006) ("Plaintiff is not barred from presenting allegations or evidence with respect to aspects of that care before or after he filed the grievance if those facts are related to the alleged ongoing problem with obtaining proper medical treatment for the condition."); *Meeks v. Suliene*, No. 11-C-0054, 2012 WL 5985482, at *6 (E.D. Wis. Nov. 29, 2012) (holding that prisoner's grievance regarding a specific instance where doctor refused to treat him sufficiently exhausted his claim that doctor was deliberately indifferent to his medical needs for the next several years) Nor is it of consequence that Plaintiff does not mention Defendant Carter in the grievance. The Seventh Circuit has held that the PLRA itself does not require that an inmate identify a responsible

party in a grievance. *Maddox,* 655 F.3d at 722-23. The Court therefore concludes that Plaintiff administratively exhausted his claim against Dr. Carter. Summary judgment for Defendant Carter based on failure to exhaust is denied.

**B.     The Merits**

Defendant Carter and the IDOC Defendants next both move for summary judgment on the ground that Plaintiff has not provided sufficient evidence that he suffered from an objectively serious medical condition and that, even if he did, he has not shown that they were deliberately indifferent to his condition. (Dkt. 97, Carter Mem. at 10-14; Dkt. 101, IDOC Mem. at 4-8.) The Eighth Amendment's proscription against cruel and unusual punishment "safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir, 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Roe*, 631 F.3d at 857 (quoting *Estelle*, 429 U.S. at 104). A deliberate indifference claim consists of both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An inmate must be able to establish both: (1) he suffered an objectively serious medical condition, and (2) defendants acted with deliberate indifference to that condition. *Id.* The Court addresses these components in turn.

**1.     Objectively Serious Medical Need**

Both Defendant Carter and the IDOC Defendants argue that Plaintiff did not demonstrate an objectively serious medical condition for the purposes of this claim. (Dkt. 97, Carter Mem. at 11-12; Dkt. 101, IDOC Mem. at 4-5.) A medical need is objectively serious when "the inmate's

condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe,* 631 F.3d at 857). Indications of a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). "Failure to 'dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not...violate the Constitution.'" *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Stomach pain with no attendant symptoms other than diarrhea, which resulted from drinking discolored and foul-smelling water on one occasion, is not an objectively serious medical condition. *See*, *e.g.*, *Perez v. Hardy*, No. 13 C 5635, 2015 WL 5081355, at *7 (N.D. Ill. Aug. 27, 2015) (plaintiff's complaints of stomach pain from drinking toilet water held not to constitute serious medical condition); *Davis v. Marion Cty. Sheriff's Dep't*, No. 1:09-CV-681-RLY-DML, 2010 WL 3893813, at *3 (S.D. Ind. Sept. 29, 2010) (plaintiff's vague complaints of stomach pain did not rise to level of a "serious medical need"); *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (holding that the plaintiff's stomach disorders did not qualify as a "serious medical need"); *Zerby v. Fla. Dep't of Corr.*, 2009 WL 3418240, at *6 n.3 (N.D. Fla. Oct. 20, 2009) (holding that there was no objectively serious medical condition where the plaintiff "failed to allege facts suggesting that the stomach pain rose to the level of a serious medical need"); *Maurice v. N.Y.C. Dep't of*

*Corr.*, 1997 WL 431078, at *3 (S.D.N.Y. July 30, 1997) (holding that the plaintiff failed to satisfy the objective element where he alleged only stomach cramps and diarrhea). These holdings comport with the Seventh Circuit standard set forth above that an undiagnosed condition is objectively serious only if a lay person would perceive it as obviously requiring the care of a doctor.

Plaintiff contends that it is the prolonged nature of his stomach pains, engendered by Defendants' delay, that renders his condition objectively serious. (Dkt. 105, Pl.'s Resp. Mem. at 4.) While the Court credits Plaintiff's complaints that his stomach aches were painful, as it must at this stage, those complaints alone are not sufficient to demonstrate objective severity in this context. Where, as here, an inmate relies upon a delay in treatment to show an objectively serious medical condition, he must show – with "verifying medical evidence" – that the claimed delay had a detrimental effect on or worsened his condition. *See Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *see also Reece v. Groose*, 60 F.3d 487, 491-92 (7th Cir. 1995) (stating in *dictum* that such evidence "goes to the objective component of the alleged medical-needs violation of the Eighth Amendment").

Defendant Carter argues that, here, there is no objective medical evidence verifying that Plaintiff had a serious medical need resulting from drinking the water in his cell on January 5, 2012. (Dkt. 97, Carter Mem. at 11-12.) Defendant Carter emphasizes that Plaintiff's stool sample showed no abnormalities, that his numerous examinations otherwise revealed no abnormalities, and that he had at most lost one pound. (*Id.*)

Plaintiff points to no objective medical evidence tending to verify that he had a serious medical condition stemming from one instance of drinking the water in his cell on January 5, 2012,

much less that any delay in treatment worsened any such condition. Without such evidence, Plaintiff has not demonstrated a "serious medical need", even despite his pain complaints. *See Knight*, 590 F.3d at 466; *see also Gonzalez v. Hardy*, No. 11 C 8578, 2015 WL 6528112, at *6 (N.D. Ill. Oct. 27, 2015) (granting summary judgment to defendant doctor where plaintiff had produced only his own opinion that new shoes should give him less pain, without any supporting medical evidence); *Padilla v. Bailey*, No. 09 C 8068, 2011 WL 3045991, at *6 (N.D. Ill. July 25, 2011) ("[B]ecause [plaintiff] did not introduce 'verifying medical evidence that shows that his condition worsened because of the delay,' his claim fails.") (quoting *Knight*, 590 F.3d at 466)); *see also Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (concluding at summary judgment that plaintiff's complaints of "breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy" due to repeated exposure to second-hand cigarette smoke did not constitute a serious medical condition); *Boyce v. McKnight*, No. 14 C 0418, 2015 WL 8778330, at *11 (N.D. Ill. Dec. 15, 2015) (plaintiff's pain complaints alone of lingering effects of pepper spray were not sufficient to show objectively serious medical condition at summary-judgment stage).

Accordingly, summary judgment for both Defendant Carter and the IDOC Defendants on Plaintiff's medical care claim is warranted.

### 2. Subjective deliberate indifference

Summary judgment should also be granted on the alternative ground that Plaintiff has not shown Defendants' subjective deliberate indifference. Plaintiff must demonstrate that the Defendant in question was aware of, and consciously disregarded, his medical need. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04; *Rowe v. Gibson*, 798, F.3d 622, 627 (7th Cir. 2015). The Court addresses Defendant Carter and the IDOC Defendants in turn below because "[c]laims of

deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

### a. Defendant Carter (medical defendant):

With respect to medical professionals like Defendant Carter, neither negligence nor a bad result stemming from "a reasonable medical judgment" suffices to meet Plaintiff's burden on the subjective component of his claim. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). A plaintiff must instead show that a medical defendant knew of "a significant risk to inmate health or safety," and nevertheless "administered 'blatantly inappropriate' medical treatment," "acted in a manner contrary to the recommendation of specialists, or delayed a prisoner's treatment for non-medical reasons, thereby exacerbating pain or suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal citations omitted); *see also Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice."). "Blatantly inappropriate" treatment in this context has also been described as treatment based on a substantial departure from accepted medical judgment, practice, or standards. *Roe*, 631 F.3d at 857 (*citing Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)).

Plaintiff first contends that Defendant Carter should have evaluated him sooner, and that the purported delay demonstrates deliberate indifference. To succeed on this theory, Plaintiff must initially show that Defendant Carter had actual knowledge of his condition prior to first treating him for stomach pain, but took no reasonable steps to address it. *Arnett v. Webster*, 658 F.3d 742, 750-51 (7th Cir. 2011). Plaintiff argues that the January 15, 2012 letter that he wrote to Dr. Carter put Defendant on notice of his request for treatment approximately two weeks before he

was first treated for his stomach pains on January 31, 2012. (Dkt. 107, Pl.'s Decl. at pp. 8-9, ¶¶ 29-31; Dkt. 105 Pl.'s Resp. Mem. at 17-18.).

There is a question as to whether Plaintiff brought his condition to Dr. Carter's attention prior to Plaintiff's January 31, 2012 appointment. Plaintiff's January 15, 2012 letter to Dr. Carter stated that Plaintiff was having severe stomach pains, headaches, and diarrhea from having drunk the dirty water on January 5, 2012, and that he wanted to see a doctor. (Dkt. 107, Pl.'s Decl. at ¶ 29; IDOC SOF at Ex. A, p. 14.) Defendant Carter testified that he did not personally receive any written request for treatment by Plaintiff. (Dkt. 96, Carter SOF ¶ 22; Dkt. 97, Carter Mem. at 10.) Plaintiff has not introduced evidence above and beyond his letter that tends to refute Dr. Carter's testimony.[6] *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (noting that plaintiff had no evidence that defendant knew of plaintiff's conditions and communications because evidence showed that defendant "d[id] not review inmate correspondence related to grievances" but "delegated [that task] to subordinates").

But even if the fact that Plaintiff sent the letter despite that Defendant Carter testified that he did not receive it were alone sufficient to create a genuine issue of fact as to Dr. Carter's knowledge of Plaintiff's condition, Plaintiff has not, as explained above, introduced verifying medical evidence that shows his condition worsened because of the two-week time lapse.

---

[6] Plaintiff testified in paragraph 28 of his declaration that when he saw Dr. Carter on January 9, 2012 for his kidney problems, he also "expressed to Dr. Carter his stomach discomfort and pain". (Dkt. 107, Pl.'s Decl. at p. 8, ¶ 28.) This testimony, however, directly conflicts with Plaintiff's unequivocal deposition testimony that his January 15, 2015 letter was his first attempt to communicate with Dr. Carter regarding his complaints related to the drinking water. (Dkt. 96, Carter SOF at ¶ 20; Riley Dep. at 76: 12-23.) The Court has therefore disregarded paragraph 28 of Plaintiff's declaration. "[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) (quoting *Lorillard Tobacco Co. v. A&E Oil, Inc*., 503 F.3d 588, 592 (7th Cir. 2007)). "A deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Group Intern., Inc.,* 766 F.3d 735, 741 (7th Cir. 2014) (citations omitted).

Plaintiff cannot hold Defendant Carter liable on a delay theory without "verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Knight,* 590 F.3d at 466 (internal quotations omitted) (quoting *Williams,* 491 F.3d at 715); *see Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"); *Johnson v. Sango*, 1996 WL 67704, at *2 (7th Cir. 1996) ("Although [the plaintiff] did allege some delay in the taking of his x-rays, [the plaintiff's] alleged back and shoulder pain was not of the severity to require immediate medical attention and thus it was reasonable for [the doctor] to delay treatment until she had seen the x-rays."). Moreover, "[a] court examines the totality of an inmate's medical care in determining whether prison officials have been deliberately indifferent to a prisoner's serious medical needs." *See Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999). Here, in the three-week time span immediately following the two-week wait to obtain an appointment, Plaintiff was seen three times by two different doctors for this condition – on January 31, 2012, February 16, 2012, and February 20, 2012. (Dkt. 96, Carter SOF at ¶¶ 24, 28, 31.) In view of this overall record, the two-week delay could at the very most arguably be construed as an "isolated incident of neglect . . . [that] cannot support a finding of deliberate indifference." *Gutierrez,* 111 F.3d at 1373 (plaintiff's complaints of incidences of delay were not evidence of deliberate indifference where plaintiff was provided treatment for condition at issue nine times within the relevant ten-month period).

Plaintiff has also not shown that once his treatment began, it was "blatantly inappropriate". Plaintiff seems to believe that the right doctor or additional testing could and would have

[28]

discovered a cure for his stomach pains. (Dkt. 105, Pl.'s Resp. Mem. at 8-9.) Plaintiff submitted an excerpt of a medical treatise regarding "chronic gastritis", which states that an x-ray can reveal changes to the lining of the stomach. (Dkt. 107, Pl.'s Resp. to Carter SOF at p. 18, ¶ 43.) Plaintiff argues that despite not being able to explain his stomach pain, Defendant Carter did not order such diagnostics or refer him to a specialist. (*Id.;* Dkt. 105, Pl.'s Resp. Mem. at 9.)

No reasonable jury could find that Defendant Carter's treatment decisions "demonstrate[d] an absence of professional judgment, that is that no minimally competent professional would have so responded under those circumstances." *Arnett,* 658 F.3d at 751 (*quoting Roe, supra*). Questions of whether certain diagnostic techniques or forms of treatment are warranted are a "classic example of a matter for medical judgment." *Estate of Cole ex rel. Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (quoting *Estelle*, 429 U.S. at 97); *Echols v. Craig*, No. 11 C 6686, 2012 WL 2872449, *2 (N.D. Ill. Jul. 10, 2012). Nor did Plaintiff have a constitutional right to see a specialist. *See Kendrick v. Frank*, 310 F. App'x 34, 38 (7th Cir. 2009). Here there is no evidence of, or reason to believe, that there is a medically indicated course of treatment that Defendant Carter had unreasonably refused to provide. The results of Plaintiff's stool analysis showed no abnormalities and no presence of bacteria that one might contract from drinking contaminated water. (Dkt. 96, Carter SOF at ¶ 31.) He had also lost at most only one pound while he was under Defendant Carter's care. (*Id.* at ¶ 36.)

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (*quoting Jackson*, 541 F.3d 688 at 697). A prison physician is generally free to determine the necessity of certain treatments or medications, so long

[29]

as the determination is based on the physician's professional judgment and does not go against accepted professional standards. *Id*. (citations omitted); *see also Ortiz v. Webster*, 655 F.3d 731, 737 (7th Cir. 2011) ("[A] reasonable response to a medical risk . . . can never constitute deliberate indifference."). The mere inability to effect a final "cure" for Plaintiff's stomach complaints does not necessarily support a finding of deliberate indifference. *See Lieberman v. Budz*, No. 00 C 5662, 2010 WL 3522998, *1 (N.D. Ill. Sep. 2, 2010) (*citing Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996)).

As Defendant Carter argues, the totality of the care Plaintiff received for his stomach pain and other conditions negates an inference of deliberate indifference. (Dkt. 97, Carter Mem. at 13-14.) Again, Plaintiff was seen by two different doctors on three occasions – January 31, 2012, February 16, 2012, and February 20, 2012 – all within a short three-week period in the month following drinking the water. (*See supra* at pp. 9-10.) He was physically examined, provided with stool hardeners, and an analysis of his stool was ordered. During the same time period, the record also reflects an ongoing course of care by Defendant Carter for Plaintiff's chronic renal insufficiency and knee pain, including medical examinations, diagnostic tests, prescribed narcotics and medications, and referrals to outside hospitals and specialists. "[T]he Eighth Amendment does not require that prisoners receive unqualified access to health care . . . . Rather, they are entitled to only adequate medical care." *Johnson*, 433 F.3d 1001, 1013 (7th Cir. 2006) (internal punctuation and citations omitted); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of

serious harm to her.").  Based on the comprehensive and ongoing care Plaintiff received, no reasonable jury could find that Defendant Carter withheld medically necessary care.

In sum, nothing in the record here establishes either a refusal to treat Plaintiff or a substantial departure by Defendant Carter from acceptable medical judgment.  On the contrary, the record establishes ongoing and comprehensive care for Plaintiff's stomach issues and his other medical conditions.  Plaintiff having "fail[ed] to make a showing sufficient to establish the existence of an element essential to [his] case [subjective deliberate indifference], and on which [he] will bear the burden of proof at trial," Defendant Carter is entitled to summary judgment. *Celotex*, 477 U.S. at 322; *see also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).

### b.    IDOC Defendants (non-medical):

#### i.    *Defendants Edwards, Hardy & Godinez*

Non-medical prison administrators, like Defendants Edwards, Hardy, and Godinez, are insulated from liability if they reasonably rely on the judgment of medical professionals.  *Johnson v. Doughty,* 433 F.3d 1001, 1012 (7th Cir. 2006).  If, however, a non-medical defendant has reason to believe, or actual knowledge, that prison doctors are mistreating or not treating a prisoner, that protection disappears.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008) (citing *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004).)

Plaintiff's claim against Edwards, Godinez, and Hardy is that they ignored his letters to them describing his pain and requesting medical care, and that they failed to investigate his complaints of purported deliberate indifference and intervene to obtain additional care.  (Dkt.

105, Pl.'s Resp. Br. at 6.)  Defendants rely on the above-cited caselaw and contend that they are insulated from liability because they were entitled to rely on the judgment of Plaintiff's doctors. (Dkt. 101, IDOC Mem. at 7-8.)

Defendants' argument is misguided because there is no evidence of record demonstrating that Defendants *in fact* relied on Plaintiff's doctors.  Defendants do not deny receiving Plaintiff's letters, which arguably gave them "reason to believe" he was not being treated since each letter stated that Dr. Carter had not responded to Plaintiff's requests to be seen.  *See King,* 680 F.3d at 1018.  Defendants do not assert, nor is there any evidence of record to suggest, that Defendants investigated Plaintiff's complaints and assessed that additional care was unnecessary or alternatively arranged medical care on Plaintiff's behalf.

Nonetheless, Plaintiff's claim against Defendants Edwards, Hardy, and Godinez, premised upon only a failure to investigate and intervene, ultimately must fail as a matter of law for the alternative reasons that there was no underlying constitutional violation here.  "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation...."  *Rosado v. Gonzalez,* No. 15-3155, ---F.3d---, 2016 WL 4207961, at *3 (7th Cir. Aug. 10, 2016) (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)).  As demonstrated above, Plaintiff received constitutionally adequate medical care.  (*See supra* Section III.B.2.a.) As there is no evidence of deliberate indifference in the record against Defendant Carter, there can be no liability against Defendants Edwards, Hardy, and Godinez for failing to assist beyond the care already being provided to Plaintiff.

Summary judgment is therefore granted for Defendants Edwards, Hardy, and Godinez on Plaintiff's deliberate indifference to medical care claim.

ii.     *Defendant Sheehy*

Plaintiff's 21-page response memorandum does not in any place discuss and defend his deliberate indifference claim against Defendant Sheehy, despite thoroughly addressing each of Plaintiff's other claims.   (Dkt. 105, Pl.'s Resp. Mem.)   Plaintiff has therefore forfeited his claim against Sheehy.   *See Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to Cracker Barrel's motion for summary judgment."); *Witte v. Wis. Dep't of Corr.,* 434 F.3d 1031, 1038 (7th Cir. 2006) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."); *McQueen v. City of Chicago*, No. 09 C 2048, 2014 WL 1715439, at *6 (N.D. Ill. Apr. 30, 2014) (plaintiff forfeited two claims not addressed in his summary judgment response).

In any event, no reasonable jury could conclude that Plaintiff presented to Defendant Sheehy with an objectively serious medical condition or that Defendant Sheehy's actions exhibited deliberate indifference.   Plaintiff interacted with Defendant Sheehy about the events at issue in this lawsuit only when Sheehy responded to Plaintiff's complaints on January 5, 2012.   At that time, Plaintiff complained only of stomach pain that had started about 45 minutes earlier when he drank discolored and smelly water.   (Dkt. 107, Pl.'s Decl. at ¶ 2.)   Based on that complaint, Defendant Sheehy cannot be said to have known that Plaintiff was suffering from an objectively serious medical need.   *See Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010) (nurse who did not provide inmate with medication for his reports of nausea, but instead put inmate on the sick call, was not deliberately indifferent to a serious medical need because inmate exhibited no

objectively serious symptoms such as vomiting); *Artis v. Meisner*, No. 12-CV-589-WMC, 2015 WL 5749785, at \*3 (W.D. Wis. Sept. 30, 2015) (nurse clinician who prescribed inmate Maalox for complaint of stomach pain could not "be said to have known that [the inmate] was suffering from an objectively serious medical need").   And there is no evidence of deliberate indifference in the record: Defendant Sheehy took reasonable steps to alleviate Plaintiff's pain by giving him Amalgam and Milk of Magnesia.   (Dkt. 107, Pl.'s Decl. at ¶ 2.)

Summary judgment is therefore granted for Defendant Sheehy on Plaintiff's claim for deliberate indifference to his medical needs.

\* \* \*

Summary judgment being appropriate in favor of all Defendants on all claims, judgment shall be entered in favor of all Defendants.   If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment.   *See* Fed. R. App. P. 4(a)(1).   If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome.   *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998).   If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g).   If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury.   *Id.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court.   *See* Fed. R. App. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights.   However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion

under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## <u>Conclusion</u>

The IDOC Defendants' motion for summary judgment [100] is granted. Defendant Carter's motion for summary judgment [95] is granted. Judgment shall be entered in favor of Defendants Sheehy, Edwards, Hardy, Godinez, and Carter. This case is closed.


_____/s/_____

Date: 8/29/16                                        Joan B. Gottschall
                                                     United States District Judge